UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP., <br><br> Plaintiff, <br><br> v. <br><br> BOSTON SCHOOL COMMITTEE and MARY SKIPPER, in her official capacity as Superintendent of the Boston Public Schools, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:25-cv-12015-WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

By motion filed herewith, Defendants Boston School Committee and Mary Skipper, Superintendent of Boston Public Schools (collectively "BPS"), have moved to dismiss the Complaint in its entirety under Fed. R. Civ. P. 12(b)(6) for failure to state a cognizable claim. Plaintiff Boston Parent Coalition for Academic Excellence Corp. ("Coalition"), parents of white students denied admission to the BPS Exam School of their preference, is back before this Court, once again claiming that BPS's evenly applied, facially race-neutral admission plan – this time based on the socioeconomic tiers in which applicants fall – allegedly violates their equal protection rights.

The First Circuit's (and this Court's) prior holdings in the Coalition's previous lawsuit, which attacked BPS's previous zip-code based Exam School admissions plan, plainly govern here. *See Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46 (1st Cir. 2023), *cert. denied,* 145 S. Ct. 15 (2024); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, No. CV 21-10330-WGY, 2021 WL 4489840 (D. Mass.

1

Oct. 1, 2021). And as these holdings make clear, in claiming BPS's socioeconomic tier-based admission plan resulted in less Exam School over-representation than the over-representation white students previously enjoyed, the Coalition has failed to allege the adverse disparate impact necessary for a viable equal protection claim. Just as plainly, by flatly asserting that BPS implemented its race-neutral plan mindful, and even desirous, of the racial diversity it hoped to engender, does not suffice for purposes of alleging that BPS acted with invidious discriminatory purpose, also necessary for a viable equal protection claim.

For these reasons, fully argued below, the Court should dismiss the Coalition's Complaint in its entirety.

**I.      RELEVANT FACTS ALLEGED IN COMPLAINT.**

BPS operates three schools that require applications for admission – Boston Latin School ("BLS"), Boston Latin Academy ("BLA"), and the John D. O'Bryant School of Mathematics and Science ("O'Bryant"). Compl. ¶¶ 1, 18. These three schools ("Exam Schools") enroll about 6,000 students in grades 7-12.[1] *Id*. ¶ 18.

Exam Schools admission generally involves two entry points. Compl. ¶ 21. Most seats at BLS and BLA are awarded to incoming seventh graders, with a smaller pathway to admission for incoming ninth graders, primarily designed to fill seats vacated by attrition. *Id*. O'Bryant admits a somewhat smaller seventh-grade class and a larger ninth-grade class, with a handful of students admitted in tenth grade to fill seats vacated by attrition. *Id*.

Admission to the Exam Schools is competitive. Compl. ¶ 20. For example, for the seventh-grade class entering in the fall of 2020, nearly 3,000 students applied for the

---

[1] Overall, BPS educates more than 48,000 students in early education programs through 12th grade in 121 schools. *See* https://www.bostonpublicschools.org/about-bps (last accessed Sept. 11, 2025).

approximately 1,000 available seats across the three schools. *Id*. For the 2024-25 school year, over 1,300 rising seventh-grade students applied for 976 available seats. *Id*.

In January 2021, the School Committee appointed a Task Force to devise a new Exam School admissions process.[2/] Compl. ¶ 51. Among the options the Task Force considered and ultimately recommended was a proposal to place applicants into socioeconomic "tiers" based on a number of socioeconomic factors and to invite equal numbers of students from each tier. *Id*. ¶ 62.

Accepting the Task Force's recommendation, then-BPS Superintendent Brenda Cassellius proposed a socioeconomic tier-based plan to the School Committee, which, on July 14, 2021, voted it in for the 2022-23 school year. Compl. ¶ 65. Under the plan, students were assigned to one of eight equally-sized socioeconomic tiers based on five socioeconomic factors from the U.S. Census Bureau's American Community Survey ("ACS"): limited English households, single parent households, owner occupied households, educational attainment, and poverty. *See* BPS SY25-26 Exam School Invitation Summary at 3-4, https://drive.google.com/file/d/1tP8p64bb0Hd7EEGJKr0Syoy9fN2MdqTG/view?usp=drive_link (last accessed Sept. 11, 2025).

Exam School invitations were divided evenly among the highest-scoring students in each socioeconomic tier. *Id*. ¶¶ 63, 65, 82. Each student's score was based entirely on grade point average ("GPA"), with an additional zero to fifteen bonus points awarded if the applicant attended a high-poverty elementary school (the most common way to get bonus points),

---

[2/] The particulars of BPS's previous, zip-code-based Exam School admissions plan, unsuccessfully challenged by the Coalition in the last case, is detailed in the First Circuit's decision. *See Bos. Parent Coal.*, 89 F.4th at 51-53. Curiously, the Coalition spends a great deal of Complaint space on wide-ranging allegations about the zip-code plan (*see* Compl. ¶¶ 28-48) despite the fact that that plan, after full litigation, was found to pass constitutional muster. *See Bos. Parent Coal*., 89 F.4th at 46-63.

experienced homeless, was in the care of the Department of Children and Families, or lived in public housing. *Id*. ¶¶ 63, 77.

Invitations were distributed across ten rounds, with each of the eight tiers selecting 10% of its allocated invitations in each round. *Id*. ¶ 80. Tier 1, the most disadvantaged socioeconomic tier, would proceed first, Tier 2 second, and so on, through Tier 8, the most advantaged socioeconomic tier. *Id*.

For the 2023-24 school year, BPS utilized the same socioeconomic tier-based plan, but calculated a composite score for each student, based 70% on GPA and 30% on their score on the MAP Growth assessment exam, a standardized test that measures academic achievement in reading and mathematics. Compl. ¶¶ 63, 82, 88.

For the 2024-25 school year, BPS adjusted the bonus point system so that the number of points a student received for attending an economically disadvantaged sending school also varied by tier. Compl. ¶¶ 100, 102.

For the 2025-26 school year, BPS used the same basic plan but reduced the number of socioeconomic tiers from 8 to 4. Compl. ¶ 108.

The Coalition, representing the parent-members of 14 white students, alleges that they applied for Exam School admission for the 2023-24, 2024-25, and 2025-26 school years, but that, because of the socioeconomic tier-based admissions plan used, were denied admission to the Exam School of their choice.[3/] Compl. at ¶ 12. The Coalition also represents the parent-members of 7 other white students who will allegedly apply for Exam School admission for the

---

[3/] The students identified did not necessarily apply to admission to all 3 Exam Schools, many listing BLS and/or BLA as their only choices. *See* Compl. ¶ 12.

2026-27, 2027-28 and 2028-29 school years and that they will be harmed by future use of any socioeconomic tier-based admissions plan.[4/] *Id.* at ¶ 14.

As for relevant demographics, the Census Bureau's ACS shows that in 2023 the total Boston population aged 10 to 14 (the ACS age-group into which students applying for 7th and 9th grade Exam School admission fall) is 25,844, whereas the white population aged 10 to 14 is 5,598, meaning that white students make up approximately 21.6% of students eligible for Exam School admission. *See* Census Bureau Tables B01001 (Boston Sex by Age 2023), https://data.census.gov/table/ACSDT1Y2023.B01001?q=race+and+age&g= 160XX00US2507000, and B01001A (Boston Sex by Age (White Alone) 2023), https://data.census.gov/table/ACSDT1Y2023.B01001A?q=race+and+age&g= 160XX00US2507000 (last accessed Sept. 11, 2025).[5/]

BPS's Exam School demographics – cited to repeatedly and relied upon by the Coalition – show that for school years 2021-22 through 2025-26 admissions rates for white students varied considerably from year to year, with white students receiving the following percentages of 7th grade invitations to the Exam Schools:

| | |
|---|---|
| SY2021-22 | 30.6% |
| SY2022-23 | 24.5% |
| SY2023-24 | 24.4% |
| SY2024-25 | 25.2% |
| SY2025-26 | 31.7% |

---

[4/] The Coalition identifies 4 additional students (3 Asian-American students and 1 "white and Hispanic" student) who were allegedly denied admission to the Exam School of their preference (*see* Compl. ¶¶ 12(h), (k) and (l)) and 3 additional (Asian-American) students who will allegedly apply to Exam Schools in the future (*see Id.* ¶¶ 14(c) and (e)). However, the Coalition makes no allegation whatsoever that any of these students were denied, or will be denied, admission under the tier-based plan because of their races.

[5/] In ruling on a motion to dismiss for failure to state a claim, a court may consider documents, the authenticity of which are not disputed by the parties, official public records and documents attached to or sufficiently referenced in the complaint. *Thornton v. Ipsen Biopharmaceuticals, Inc.*, 126 F.4th 76, 81 (1st Cir. 2025); *Douglas v. Hirshon*, 63 F.4th 49, 57 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 621 (2024). The Court can consider the ACS data not only because it is an indisputable official public record of which the Court may take judicial notice, but also because the Coalition repeatedly cites to Exam School-related data and documents from BPS's official public website (*see, e.g.,* Compl. nn. 2, 3, 4, 6, 11, 17, 18, 20, 21, 24-26), which itself relies on ACS data. *See generally,* BPS website citations at Compl. nn. 18-26.

5

*See* BPS SY25-26 Exam School Invitation Summary at 5, https://drive.google.com/file/d/1tP8p64bb0Hd7EEGJKr0Syoy9fN2MdqTG/view?usp=drive_link (last accessed Sept. 11, 2025) (cited at Compl. n.24).

The numbers for admission to Boston Latin School ("BLS"), a main focus of the Coalition's allegations (*see, e.g.*, Compl. ¶¶ 1, 3, 12, 70-119), are even higher for white students. Again showing substantial year-to-year variability, white students received the following percentages of 7th grade invitations to BLS in the school years listed:

| | |
|---|---|
| SY2021-22 | 38% |
| SY2022-23 | 23% |
| SY2023-24 | 30% |
| SY2024-25 | 30% |
| SY2025-26 | 38% |

*See* SY25-26 Exam School Invitation Summary at 6.

The Coalition's core claim is that BPS "intentionally implemented, and continue[s] to administer, the Tier System for the purpose of limiting the proportion of white students who may enroll at the Exam Schools." Compl. ¶ 128. As it must, the Coalition acknowledges that "…the Tier System is facially race-neutral…" *Id*. ¶ 129.[6]

## II.    APPLICABLE LEGAL STANDARDS.

### A.    Rule 12(b)(6) Motion To Dismiss.

When deciding a Rule 12(b)(6) motion to dismiss, a court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012) (citing *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006)). The Court "may augment these facts and inferences with data points gleaned

---

[6] Additional facts will be discussed as necessary below.

from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Id.* (citing *Haley v. City of Boston,* 657 F.3d 39, 46 (1st Cir. 2011)).

Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)). However, "that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation") (internal quotation marks omitted)).

### B. Section 1983 And The Equal Protection Clause Of The Fourteenth Amendment.

42 U.S.C. § 1983 allows a claim "against any person who, while acting under color of state law, violates another person's federally assured constitutional or statutory rights." *McKenney v. Mangino*, 873 F.3d 75, 79 (1st Cir. 2017) (citing *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997)).[7] In turn, "[t]he Fourteenth Amendment prohibits 'all governmentally imposed discrimination based on race,' save for those rare and compelling circumstances that can survive the daunting review of strict scrutiny." *Bos. Parent Coal.*, 89 F.4th at 56 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023)). The

---

[7] § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Equal Protection Clause's "central purpose" is to "prevent the States from purposefully discriminating between individuals on the basis of race." *See Shaw v. Reno*, 509 U.S. 630, 642 (1993).

Where, as here, a plaintiff challenges an evenly applied, facially race-neutral government plan on equal protection grounds,[8/] the complaint must sufficiently allege *both* that the plan has a disparate impact *and* was motivated by a discriminatory purpose. *Bos. Parent Coal.*, 89 F.4th at 57 ("an equal protection cases…requires proof of both disparate impact and discriminatory intent") (citing *Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)); *see also Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 879 (4th Cir. 2023), *cert. denied*, 218 L. Ed. 2d 71 (Feb. 20, 2024) ("[T]o demonstrate that an evenhanded, facially race-neutral policy like that challenged here is constitutionally suspect, the plaintiff pursuing an Equal Protection challenge must show (1) that the policy exacts a disproportionate impact on a certain racial group, and (2) that such impact is traceable to an 'invidious' discriminatory intent.").

As to disparate impact, "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 543 (2015) (in Fair Housing Act ("FHA") context). A prima facie case of disparate impact is "…essentially, a threshold showing of a significant statistical disparity…." *Ricci v. DeStefano*, 557 U.S. 557, 587 (2009) (*citing Connecticut v. Teal*, 457 U.S. 440, 446 (1982) (Title VII); *see also*, *Jones v. City of Bos.*, 752 F.3d 38, 46 (1st Cir. 2014) (citing *Ricci*,

---

[8/] "Generally, purposeful racial discrimination violative of the Equal Protection Clause falls into three categories of state action that merit strict scrutiny: (1) where state action expressly classifies individuals by race; (2) where a policy is facially neutral but is in fact unevenly implemented based on race; and (3) where a facially race-neutral, and evenly applied, policy results in a racially disparate impact and was motivated by discriminatory intent." *Bos. Parent Coal.*, 89 F.4th at 56-57 (internal citations omitted).

8

557 U.S. at 587). On a motion to dismiss, "the question is whether [the complaint] allegations are sufficient at the pleading stage to allow the Court to infer that such disparities result in 'an adverse effect on the protected group.'" *Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 39 (D. Mass. 2023) (quoting *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1085-86 (D.C. Cir. 2011)) (FHA)).

As to discriminatory purpose, "'[s]moking gun' proof of discrimination is rarely available, especially at the pleading stage." *Grajales*, 682 F.3d at 49. As such, "'[t]he plausibility threshold 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the illegal conduct.'" *Id.* (quoting *Ocasio-Hernàndez v. Fortuño-Burset*, 640 F.3d 1, 17 (1st Cir. 2011)). However, as always, the Court "safely may ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (quoting *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) ("Even in cases where elusive concepts such as motive or intent are at issue, [plaintiff may not rest] merely upon conclusory allegations, improbable inferences, and unsupported speculation.") (citing *Rossy v. Roche Products, Inc.*, 880 F.2d 621, 624 (1st Cir. 1989) and *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 109-10 (1st Cir. 1988)).

**III.   ARGUMENT.**

Application of these well-accepted principles to the Complaint's allegations shows that the Coalition has failed to state a legally viable equal protection claim. The Coalition alleges no actionable adverse disparate impact, nor does it plausibly allege the race-based animus necessary for an equal protection claim. As such, the Complaint – and this entire case – should be dismissed.

### A. The Complaint Alleges No Actionable Adverse Disparate Impact.

As the First Circuit has made clear, to sufficiently allege adverse disparate impact in the exact context of this case, admissions to BPS Exam Schools, an equal protection plaintiff must do more than point to an "alleged reduction – but not reversal – of certain races' stark over-representation in the pool of selectees." *Bos. Parent Coal.*, 89 F.4th at 58. After all, the Court reasoned, such a reduction merely shows what disparate-impact jurisprudence generally encourages: "as between equally valid selection processes that meet the selector's legitimate needs, to use the one that reduces under-representation (and therefore over-representation as well)." *Id.* Here, the statistics reflect not only considerable variability in white student admissions, but that such admissions are trending higher – to its highest level in the 2025-26 school year, the latest of the four years at issue.

Indeed, in the Coalition's prior lawsuit, attacking BPS's previous, zip-code-based Exam School admissions policy, the First Circuit rejected the Coalition's statistical machinations – like those it alleges here – in favor of a much more fundamental analysis:

> The bottom line remains the same: White and Asian students respectively made up approximately 16% and 7% of the eligible school-age population and 31% and 40% of the successful applicants. Use of the Plan caused no relevant disparate impact on those groups. *Cf. Coal. for TJ*, 68 F.4th at 879 (finding no disparate impact on Asian-American students under school admissions policy where "those students have had greater success in securing admission to [the school] under the policy than students from any other racial or ethnic group").

*Bos. Parent Coal.*, 89 F.4th at 59 (internal footnote omitted).

The same analysis applies here. While white students made up approximately 21.6% of the school-age population eligible for Exam School admission (that is, Boston children aged 10 to 14), all the Coalition alleges is that, depending on the year, white students received somewhere between 24.4% and 31.7% of the invitations. Alleging a modest reduction in the

over-representation of white students does not establish that the use of the socioeconomic tier plan caused any "relevant disparate impact" on white students. *See Bos. Parent Coal.*, 89 F.4th at 58-59.

The Coalition does not address this point at all, instead basing its disparate impact claim on something quite different: "In three of the four years, white students have been admitted at rates below the share of white students in the applicant pool, which demonstrates disparate impact against white applicants even under the First Circuit's decision in *Boston Parent*, 89 F.4th at 59." Compl. ¶ 129; *see also Id*. ¶ 47 ("The First Circuit affirmed, but only on the ground that the Coalition had failed to demonstrate adequate disparate impact because the proportion of white and Asian-American students admitted to the Exam Schools was still higher than those groups' share of the applicant pool.").

Of course, the First Circuit said no such thing. It made no reference to the races of those who *actually applied* to the Exam Schools, but instead emphasized the races of the "eligible school-age population" as the relevant group for comparison: "White…students…made up approximately 16%...of the *eligible school-age population* and 31%...of the successful applicants. Use of the Plan caused no relevant disparate impact…." *Bos. Parent Coal.*, 89 F.4th at 59 (emphasis supplied).

The emphasis on eligible school-age population, not those who applied, makes especially good sense here given the plan's focus on changing the Exam Schools' socioeconomic diversity. In essence, the Coalition's operative allegation – "white students have been admitted at rates below the share of white students in the applicant pool" – is ultimately a claim that because more socioeconomically advantaged students apply to the Exam Schools (at least in part because those schools historically catered to the socially advantaged), there is more competition among the top

11

socioeconomic tiers for available seats, which results in lower application-to-invitation rates in those socioeconomically advantaged tiers. Not only is this conclusion not surprising, it is the *entire point* of the plan – to adopt a system in which the Exam Schools would serve a student population that much more accurately reflected the socioeconomic diversity of Boston's school-age population. Contrary to the Coalition's hyperfocus on race, the plan, by enhancing admissions across *all* socioeconomic levels of *all* eligible students, encourages a constitutionally legitimate goal.

Regardless, even were the Coalition correct in claiming that application rates are the proper comparator, it has *still* failed to allege viable disparate impact – that is, "a threshold showing of a significant statistical disparity." *Ricci*, 557 U.S. at 587. In this regard, the Coalition alleges only:

- For SY2022-23, white students made up 32% of those that applied and 25% of invitees (Compl. ¶ 87).
- For SY2023-24, white students up 29% of those that applied and 24% of invitees (*Id.* ¶ 98).
- For SY2024-25, white students made up 29% of those that applied and 25% of invitees (*Id.* ¶ 107); and
- For SY2025-26, white students made up 28% of those that applied and 30% of invitees (*Id.* ¶ 114).

At bottom, these numbers show only that white students were invited to the Exam Schools at rates sometimes higher and sometimes lower than the percentage of white students in the applicant pool. This variability – all within a tight band *substantially similar* to white students' rates of application – is a far cry from the "stark pattern" necessary for disparate racial impact. *See, e.g., Anderson v. Boston*, 375 F.3d 71, 89-90 (1st Cir. 2004) ("Here, there is no clear pattern of disparate racial impact, much less the 'stark' pattern contemplated by *Arlington Heights*…If plaintiffs had been able to show that the New Plan resulted in stark systemwide racial disparities regarding assignments to first choice schools, we might – depending on the

12

circumstances – have reached the conclusion that intentional discrimination occurred and so adopt a stricter standard of scrutiny in assessing justification. Plaintiffs chose, however, to eschew such analysis.").

Beyond the fact that the Coalition's numbers in and of themselves show no facially "stark" racial disparity, in merely offering raw percentages without any statistical analysis or related allegations, the Coalition has failed to show the "significant statistical disparity" necessary to allege disparate impact. *Ricci*, 557 U.S. at 587. In *Jones*, 752 F.3d at 50, the First Circuit held that to establish statistical significance a plaintiff must show that the probability that any alleged racial disparity occurred by chance is *less than five-percent*.[9] Offering no allegations whatsoever from which it could be inferred that the raw percentages alleged are in fact statistically significant, the Coalition has failed to allege viable disparate impact.

As the First Circuit previously held, "even assuming the Coalition's statistics show non-random demographic changes in the pool of Exam School invitees" as a result of the challenged admissions plan, "those changes simply show that as between equally valid, facially neutral selection criteria the School Committee chose the alternative that created less disparate impact, not more." *Bos. Parent Coal.*, 89 F.4th at 58. "To rule otherwise, would turn 'the previous status quo into an immutable quota' and risk subjecting any new policy that 'might impact a public institution's racial demographics - even by wholly neutral means - to a constitutional attack.'" *Id*. (quoting *Coal. For TJ*, 68 F.th at 881). Having alleged only that BPS did what disparate impact law encourages, the Coalition has failed to allege a viable disparate impact and its equal protection claim fails.

---

[9] Statisticians refer to this measure as a "probability value" or "p-value" of *less* than 0.05 (or five percent) or, alternatively, as a standard deviation value (a statistical concept directly related to p-value) of *greater* than 1.96. *See Jones*, 752 F.3d at 43-44, 47 & n.9 (collecting and citing cases). Relying on back-of-the-envelope statistics, the Coalition makes no allegation whatsoever about statistical significance.

### B.    The Complaint Alleges No Actionable Race-Based Animus.

Similarly, the Coalition fails to allege facts that plausibly show that BPS instituted the tier-based admissions policy with an invidious discriminatory purpose. "To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 140 S. Ct. 1891, 1915 (2020). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.

Critically, "[t]he Supreme Court has explained that the *motive* of increasing minority participation and access is not suspect." *Anderson*, 375 F.3d at 87 (emphasis in original) (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989) (approving the use of race-neutral means to increase minority participation in governmental programs)). In *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007), Justice Kennedy stated that this motive – and race-neutral plans designed to accomplish it – is constitutionally permissible:

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race.

(Kennedy, J.) (concurring in part and concurring in judgment).

For these reasons:

> There is nothing constitutionally impermissible about a school district including racial diversity as a consideration and goal in the enactment of a facially neutral plan. To hold otherwise would "mean that that any attempt to use neutral criteria to enhance diversity...would be subject to strict scrutiny."

*Bos. Parent Coal.*, 89 F.4th at 62 (quoting *Bos. Parent Coal.*, 996 F.3d at 48).

14

Here, for purposes of alleging discriminatory animus, the Coalition's Complaint merely – repeatedly – cites to alleged instances in which BPS's Superintendent, School Committee members or Task Force members indicated that one of the goals of the race-neutral socioeconomic tier-based admissions policy was greater racial diversity in the Exam Schools. *See, e.g.*, Compl. ¶¶ 51, 58, 60, 61, 64, 65, 68, 70. As the Supreme Court and the First Circuit have repeatedly recognized, identifying racial diversity as one of the goals of a race-neutral plan simply does not evidence race-based animus. *See, e.g.*, *Parents Involved,* 551 U.S. at 789; *City of Richmond*, 488 U.S. at 507; *Bos. Parent Coal.*, 89 F.4th at 62; *Anderson*, 375 F.3d at 87. By alleging just this, without more, the Coalition fails to plausibly allege discriminatory animus.

As noted above in footnote 2, the Coalition makes all manner of allegations concerning BPS's previous, zip-code-based admissions policy (*see* Compl. ¶¶ 28-48), ostensibly to show that because that plan was allegedly tainted by discriminatory animus, the tier-based plan, instituted in the zip-code plan's wake, must also be so tainted. Suffice to say, given that the zip-code plan was ultimately found not to have violated its members' equal protection rights (*see Bos. Parent Coal.*, 89 F.4th at 46-63), this is a most puzzling position for the Coalition to take here. Regardless, the Coalition's allegations on this point – little more than speculative theories unsupported by actual *facts* – are insufficient for purposes of viably stating a claim of animus. *See, e.g., Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996) (courts need not credit allegations supported only by "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like").

Otherwise, the Coalition resorts to unsupported conclusions and labels, repeatedly invoking various hot-button terms to describe the socioeconomic tier-based admissions plan as: "racial balancing" (Compl. ¶¶ 10, 25, 26, 28, 30, 35, 36, 57, 58); a "proxy for race" (*Id*. ¶¶ 4, 5,

15

73, 120); the perpetuation of a race-based "quota" (*Id.* ¶¶ 28-55, 59, 62, 85, 129), and "racially discriminatory" (*Id.* ¶¶ 5, 15, 49, 59, 127-34). Quite simply, without any facts to support these conclusory labels, the Coalition's allegations fall short of viably alleging that the tier-based admissions plan was implemented with an invidious discriminatory purpose. *See, e.g.*, *Cochran*, 328 F.3d at 6 (court "safely may ignore conclusory allegations, improbable inferences, and unsupported speculation").

### III.    CONCLUSION.

In the end:

> "The entire point of the Equal Protection Clause is that treating someone differently because of their skin color is *not* like treating them differently because they are from a city or from a suburb...." *Students for Fair Admissions*, 600 U.S. at 220[]. So too here, treating students differently based on the zip codes in which they reside was not like treating them differently because of their skin color.

*Bos. Parent Coal.*, 89 F.4th at 62 (emphasis in original).

And so too here: treating students differently because of their socioeconomic status is *not* like treating them differently because of their skin color. The Coalition's ongoing refusal to accept this basic reality should be rejected and its Complaint dismissed in its entirety.

Respectfully submitted,

BOSTON SCHOOL COMMITTEE and MARY SKIPPER, Superintendent of Boston Public Schools,

By their attorneys,

/s/ *Kay H. Hodge*
Kay H. Hodge (BBO # 236560)
khodge@scmllp.com
John M. Simon (BBO #645557)
jsimon@scmllp.com
Stoneman, Chandler & Miller LLP
99 High Street
Boston, MA 02110
(617) 542-6789

Dated: September 11, 2025

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent by first class mail, postage prepaid, to those indicated as nonregistered participants on September 11, 2025.

/s/*John M. Simon*
John M. Simon