UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP., | ) ) ) | |
| Plaintiff, | ) ) | No. 1:25-cv-12015-WGY |
| v. | ) ) ) | **PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS** |
| BOSTON SCHOOL COMMITTEE and MARY SKIPPER, in her official capacity as Superintendent of the Boston Public Schools, | ) ) ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

The Boston School Committee would like the Court to ignore much of the context surrounding its Tier Plan for admission to Boston Public Schools' three "Exam Schools." But the Tier Plan did not appear from nowhere. It was a product of the School Committee's relentless obsession with the racial composition of the Exam Schools and a direct descendant of the School Committee's Zip Code Plan, which was "chosen precisely because of [its] effect on racial demographics." *Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Boston*, No. 21-cv-10330, 2021 WL 4489840, at \*15 (D. Mass. Oct. 1, 2021) (*Boston Parent I*). Two School Committee members who "harbored . . . racial animus" against whites, *id.*, were still serving when the School Committee impaneled the Task Force to recommend a successor plan for the Zip Code Plan. The Superintendent and School Committee rejected a 20% reservation of seats for the City's top scorers—which had blunted the racial impact of the Zip Code Plan, *see Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Boston*, 89 F.4th 46, 58 n.3 (1st Cir. 2023) (*Boston Parent II*)—because it would benefit too many white students. And the Tier Plan achieved what the Zip Code Plan could not—for three cycles in a row, the share of white applicants accepted to

1

the Exam Schools plunged below even the group's share of the applicant pool.

The clear implication is that the Tier Plan was selected "'because of,' not merely 'in spite of'" its success at limiting the enrollment of white students. *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979). To avoid this, the School Committee offers a theory of disparate impact that goes beyond what the First Circuit or any other court has held. It says that no matter the composition of actual Exam School applicants—and no matter the evidence of intent—it can face no liability for discrimination unless it limits the proportion of white students invited to attend to below their share of the *school-age population*. This is not a plausible rule, especially in the context of competitive-admission schools which by definition do not draw from the entire cross-section of students in an area. The First Circuit's passing mention of school-age population in *Boston Parent II* should not be read as an endorsement of this novel theory. That's especially true because the theory of impact the First Circuit adopted came directly from the Fourth Circuit's decision in *Coalition for TJ v. Fairfax County School Board*, 68 F.4th 864, 881 (4th Cir. 2023), which found the share of the applicant pool was the proper comparator.

The remainder of the School Committee's arguments fall flat because this is a motion to dismiss. Even if it were correct that the Boston Parent Coalition for Academic Excellence must eventually offer some proof of statistical significance to demonstrate disparate impact, or that the Coalition must offer proof of racial animus to show discriminatory intent, neither would justify dismissal at this stage. This Court faulted the Coalition for *not* seeking discovery in the Zip Code Plan case. *Boston Parent I*, 2021 WL 4489840, at *16. This time, even if the School Committee's legal theories were correct, the Coalition has alleged enough to warrant further inquiry.

## FACTUAL BACKGROUND

***The Exam Schools.*** The Boston Latin School (BLS), Bostin Latin Academy, and John D.

O'Bryant School of Mathematics and Science are the three best public high schools in Boston, and some of the best in the country. Compl. ¶¶ 1, 19. They are known as "Exam Schools" because, until recently, they selected students based solely on the applicants' GPA and score on an objective examination. Compl. ¶ 2. Because of their reputation for excellence and rigorous curriculum, admission to the Exam Schools historically has been highly competitive. Compl. ¶ 20.

*History of Discrimination.* From 1974 through 1987, BPS was subject to a desegregation order. Compl. ¶ 22. After this Court found the Exam Schools were complicit in segregation, it ordered BPS to set aside 35% of Exam School seats for black and Hispanic applicants. *Id.*; *see Morgan v. Kerrigan*, 530 F.2d 401, 425 (1st Cir. 1976). Yet BPS chose to maintain the racial quota for years after it achieved unitary status. Compl. ¶¶ 23–24. It stopped only when this Court granted a preliminary injunction and ordered BPS to admit a white applicant to BLS. *McLaughlin v. Boston Sch. Comm.*, 938 F. Supp. 1001 (D. Mass. 1996). And even then, BPS pressed on, allocating half the seats "on the basis of 'flexible racial/ethnic guidelines." *Wessmann v. Gittens*, 160 F.3d 790, 793 (1st Cir. 1998). Only when the First Circuit held that plan, too, violated a white student's equal protection rights did BPS revert to merit-based admissions. *See id.* at 809; Compl. ¶¶ 26–27.

*The Zip Code Plan.* In 2019, BPS once again began to focus on the racial composition of the Exam Schools. Compl. ¶ 28. The next year, the School Committee established the Exam School Admissions Criteria Working Group to develop new admissions criteria. Compl. ¶ 29. Members of the Working Group made it clear that they sought to design a plan that would alter the racial composition of the Exam Schools. Compl. ¶ 30. For instance, Working Group member Tanisha Sullivan, then-president of the NAACP-Boston Branch, told the School Committee that racial gaps in assessment scores and GPA between white and Asian-American students on one hand and Black and Hispanic students on the other "played a significant role in what we will ultimately

recommend." Compl. ¶ 31. Samuel Acevedo, BPS's Opportunity and Achievement Gap Task Force Co-Chair, said that one of the Working Group's "imperatives" was "rectifying historic racial inequities afflicting Exam School admissions for generations." Compl. ¶ 32.

The Working Group recommended the Zip Code Plan. It replaced the citywide competitive admissions process with one that awarded Exam School seats in each zip code in proportion to its population of school-age students. Compl. ¶ 34. The plan allocated seats within each zip code based on the applicants' GPA, except that it reserved 20% of the seats for the applicants with the top GPAs citywide. Compl. ¶ 34. The School Committee adopted the Working Group's recommendation and endorsed the goal of racially balancing the Exam Schools. Compl. ¶ 35. Then-School Committee member Lorna Rivera observed "the issue of just really naming it you know, and really considering race and ethnicity." Compl. ¶ 36. She later argued that the Zip Code Plan did not "go far enough because white students would continue to benefit from 32 percent of the seats according to this plan. Look at the data, it's not a huge change for Asian and white families." Compl. ¶ 37.

School Committee members' statements veered beyond the intent to racially balance the Exam Schools and into overt racial animus. At the October 21 School Committee meeting, then-Chairperson Michael Loconto was caught on a hot mic mocking the names of Asian parents who spoke against the Zip Code Plan. Compl. ¶ 39. He soon resigned in disgrace. Compl. ¶ 41. During that same meeting, School Committee members Rivera and Alexandra Oliver-Davila texted each other laughing about Loconto's racist outburst. Compl. ¶ 39. Oliver-Davila texted River "[b]est sc mtg [School Committee meeting] ever I am trying not to cry." Compl. ¶ 40 (brackets in original). Rivera responded, "Me too!! Wait til the white racists start yelling [a]t us!" Compl. ¶ 40 (brackets in original). "Whatever," responded Oliver-Davila, "they are delusional." Compl. ¶ 40. Oliver-

Davila quickly followed up with "I hate W[est] R[oxbury]," a neighborhood that historically has had both a high white population and a large number of Exam School invitees. Compl. ¶ 40 (brackets in original). Rivera agreed that she was "[s]ick of westie whites," a sentiment that Oliver-Davila confirmed with "[m]e too I really feel like saying that!!!!" Compl. ¶ 40 (brackets in original). After Loconto resigned, Oliver-Davila became the acting chairperson until she and Rivera also resigned after the Boston Globe exposed their racist text messages. Compl. ¶¶ 41, 55.

*The Previous Litigation.* The Coalition argued that the Zip Code Plan violated the equal protection rights of 14 of its members whose children applied to an Exam School that year. Compl. ¶ 43. After a trial on an agreed-upon record, this Court sided with the School Committee. *Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Boston*, No. 21-10330, 2021 WL 1422827 (D. Mass. Apr. 15, 2021). But after the Boston Globe exposed the "racist text messages" between Oliver-Davila and Rivera, *Boston Parent I*, 2021 WL 4489840, at *15, the Coalition filed a Rule 60(b) motion to set aside the judgment and the Court withdrew the initial opinion as "factually inaccurate." 2021 WL 3012618, at *1 (D. Mass. July 9, 2021). Although this Court denied the motion, it recognized that the Zip Code "Plan is not the celebrated result of transcending racial classifications that this Court once found it to be," that "[t]hree of the seven School Committee members harbored some form of racial animus," and "but for the increase in Black and Latinx students at the Exam Schools, the Plan's race-neutral criteria would not have been chosen." *Boston Parent I*, 2021 WL 4489840, at *15. Ultimately, the Court sidestepped the intent question because it found that "the Coalition failed to establish a disparate impact from the Plan." *Id.*

The First Circuit affirmed. It reasoned that the plan did not suppress white and Asian admission rates enough to cause "under-representation," so the Coalition failed to show disparate impact. *Boston Parent II*, 89 F.4th at 58. The Supreme Court denied certiorari. Justice Alito, joined

by Justice Thomas, dissented, noting that "the lower courts' disparate-impact analysis was clearly flawed" and that "the lower courts mistakenly treated evidence of disparate impact as a necessary element of an equal-protection claim." *Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for Boston*, 145 S. Ct. 15, 17 (2024) (mem.). Justice Gorsuch echoed those "concerns" and admonished that "lower courts facing future similar cases would do well to consider" them. *Id.* at 15 (Gorsuch, J., statement respecting the denial of certiorari).

***The Tier Plan.*** In 2021, the School Committee convened a Task Force to recommend a permanent replacement for the Zip Code Plan and produce a "student body [that] better reflects the **racial, socioeconomic, and geographic diversity** of all students" in Boston. Compl. ¶ 51 (boldface and underline in original). The Task Force was charged to "build off" the Working Group's progress, and indeed it included many of the same people, who seem to have been chosen for their credentials on race-related matters and past criticism of Exam School admissions. Compl. ¶¶ 52–53. The School Committee that convened the Task Force still included members Oliver-Davila and Rivera, who had expressed anti-white animus. Compl. ¶¶ 54–55. It also included student representative Khymani James, who testified "I too hate white people," in a June 16, 2021, School Committee meeting. Compl. ¶ 56.

Like the Working Group before it, the Task Force was obsessed with race. Several members made comments that made their racial purpose obvious. In a clear reference to racial balancing, Task Force member Matt Cregor—who previously wrote a prominent article criticizing the racial composition of the Exam Schools—asked "can we even talk about what it is that we want to see?" Compl. ¶ 58. One Task Force member quoted controversial "antiracism" scholar Ibram X. Kendi while asserting that tests inherently "exclude black bodies," while another noted that "every indicator we've discussed using can exacerbate inequality." Compl. ¶ 60. Several members were

upset at the Zip Code Plan's reservation of 20% of the seats for top scorers citywide, with NAACP president Sullivan saying that it had never given her "peace" as a supporter of equity and justice. Compl. ¶¶ 59–60. Another member, Dr. Roseann Tung, told the School Committee that BPS must "eliminate structures that support white supremacy." Compl. ¶ 64.

The Task Force ultimately recommended the Tier Plan. The Tier Plan refined the use of geography as a proxy for race by dividing the city into "tiers" based on socioeconomic factors and reserving an equal number of Exam School seats for each tier. Compl. ¶ 63. The Task Force was divided on whether the Tier Plan should continue to reserve 20% of the seats for the highest scorers citywide. Compl. ¶¶ 62–64. But then-Superintendent Brenda Cassellius took the Task Force's recommendation and proposed the Tier Plan without the 20% reservation specifically because BPS modeling showed these seats would have gone overwhelmingly to white applicants. Compl. ¶ 65. She said a reservation of seats "goes against our desire to be an equitable anti-racist district." *Id.*

After BPS implemented the Tier Plan, the Superintendent confirmed the racial impetus behind it in multiple School Committee meetings. In October 2021, she said "[w]e put this policy together because we knew . . . not everybody had the same fair shot at the exam schools geographically, racially or by income." Compl. ¶ 68. Then in December, she urged that "[i]t's important for us to see this policy through . . . to see if we can accomplish our goals as an antiracist district." Compl. ¶ 69. Task Force member Dr. Tung went even further, telling the School Committee that "the very existence of exam schools has had intended consequences of maintaining power and privilege among white and more affluent families in Boston" and that the Tier Plan "is a long overdue start to remedy those injustices." Compl. ¶ 70.

Under the Tier Plan, applicants compete only against others in their socioeconomic tier. A student's composite score (out of 100) is 70% based on his or her GPA and 30% on his or her score

on the MAP Growth assessment. Compl. ¶ 63. Many applicants also receive bonus points, most prominently for attending a higher-poverty elementary school. *Id.* Since the School Committee approved the Tier Plan, BPS has tweaked the composition of the tiers (including going from eight to four tiers for the 2025-26 cycle) and the number of available bonus points, but the ultimate structure remains the same. Compl. ¶ 72.

So does the racial impact. The Tier Plan has been even more effective than the Zip Code Plan at suppressing the admission of white students to the Exam Schools. That's because the tiers have wildly different racial demographics and academic competitiveness. For example, under the eight-tier system that was in place from 2022-23 through 2024-25, Tier 8 was about 64% white, while Tiers 1 through 5 were less than 10% white. Compl. ¶ 74. Tier 8 also had substantially more applicants with higher composite scores, so it had much higher cutoff scores for admission to the Exam Schools. Compl. ¶¶ 88–95, 103–04, 106. That the mostly-white Tier 8 students were by far the least likely to benefit from bonus points only served to mask the actual discrepancy in cutoff scores between the tiers. Compl. ¶¶ 101, 103, 111. Under this system, white students had the lowest acceptance rate to the Exam Schools of any racial group. Compl. ¶¶ 86–87, 96–99, 105, 107. White invitees to the Exam Schools were also underrepresented relative to their share of the applicant pool all three years. Compl. ¶¶ 87, 98, 107.[1]

***This Litigation.*** On July 17, 2025, the Coalition filed this lawsuit on behalf of more than a dozen members whose children sought admission to the Exam Schools under the Tier System, and others whose children will apply in the future. Compl. ¶¶ 12–14. The Complaint alleges that the

---

[1] Under the four-tier system in place for 2025–26, white students still likely had the lowest acceptance rate of any group. Compl. ¶¶ 112–13. Modeling expected that the share of white students admitted would remain below the group's share of the applicant pool, but instead it moved slightly higher. Compl. ¶¶ 114–15.

Tier Plan violates the Equal Protection Clause because the School Committee chose it for a racially discriminatory purpose. Compl. ¶¶ 128–37. The Coalition seeks declaratory and injunctive relief— the latter in the form of admission for the children of members who have lost out on their desired Exam School due to the Tier Plan already, as well an injunction prohibiting the School Committee and BPS from continuing to use the Tier Plan in the future. Compl. ¶¶ 136–37.

## STANDARD OF REVIEW

The Court must deny the School Committee's motion unless the School Committee can show that the Complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility does not require "detailed factual allegations." *Rodriquez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013). There is no "need to set forth a detailed evidentiary proffer in a complaint." *Id.* at 54. Instead, the Complaint need only allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. And in conducting that inquiry, the Court must "accept as true all well-pleaded facts" and "draw all reasonable inferences therefrom in the pleader's favor." *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011).

## ARGUMENT

"Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 291 (1978) (controlling opinion of Powell, J.). And even when a policy is "fair on its face, and impartial in appearance," the Supreme Court has long held that it may violate the Fourteenth Amendment's equal protection guarantee if "it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons

in similar circumstances." *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886). More recently, the Court has confirmed that strict scrutiny applies "not just when [a policy] contain[s] express racial classifications, but also when, though race neutral on [its] face, [it is] motivated by a racial purpose or object." *Miller v. Johnson*, 515 U.S. 900, 913 (1995).

To trigger strict scrutiny, the Coalition need only show that racial discrimination was a "motivating factor"—race need not be "the 'dominant' or 'primary'" factor. *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Determining whether an impermissible racial purpose motivated the decisionmakers "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Relevant factors include: (1) the "impact of the official action;" (2) the "historical background of the decision;" (3) the "specific sequence of events leading up to the challenged decision;" and (4) the "legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 266–68. Ultimately, the dispositive question is whether the School Committee enacted the Tier Plan "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" white Exam School applicants. *Feeney*, 442 U.S. at 279.[2]

The First Circuit in *Boston Parent II* interpreted Supreme Court precedent to require a threshold showing of aggregate racially disparate impact. *Boston Parent II*, 89 F.4th at 61; *see also id.* at 63 ("More evidence of intent does not change the result in this case, given that our analysis assumes that the Plan was chosen precisely to alter racial demographics."). The Second Circuit disagrees. *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 171–72 (2d Cir.

---

[2] The School Committee does not attempt to defend the Tier Plan under strict scrutiny, so a plausible case under *Arlington Heights* is enough to defeat the motion to dismiss.

2024). So do multiple Supreme Court Justices. *See supra* at 6. The Coalition preserves its argument that it need not show aggregate impact, but proceeds under the *Boston Parent II* framework.

## I.    The Coalition Plausibly Alleged the Tier Plan Adversely Impacts White Applicants

Any way one looks at the data, the Tier Plan has a disparate impact on white applicants.

**First, acceptance rate.** Because the Tier Plan confines a disproportionate number of white applicants to the most competitive tier, white applicants have the lowest acceptance rate of any group. Under the eight-tier system, majority-white Tier 8 had an under 50% acceptance rate all three years, while nearly all students from Tiers 1–5 (which had almost no white students) were admitted. Compl. ¶¶ 83, 95, 106.[3] Under the four-tier system, white applicants were grouped disproportionately into Tier 4, which had the lowest invitation rate. Compl. ¶¶ 112–13.

**Second, cutoff scores.** It was more difficult for white students to gain admission to the Exam Schools as a whole, and Boston Latin School specifically, because white students are disproportionately in the tier that requires a much higher composite score for admission. In 2024–25, for example, Tier 8 students needed a composite score of 96.5 (which most had to achieve without the benefit of bonus points) for admission into any Exam School, while students from Tiers 1–5 could attend BLS with composite scores under 90. Compl. ¶¶ 103–04. In 2023-24, Tier 8 students needed a 97.1 to get into any Exam School, while students from Tiers 1–5 needed just over 70 (often aided by bonus points). Compl. ¶¶ 93–94.

**Third, share of admitted students.** The higher cutoff scores white students faced ultimately rendered the group *underrepresented* relative to their share of the applicant pool for all three years of the eight-tier system. Compl. ¶¶ 87, 98, 107. Though this did not materialize in

---

[3] Specific racial data for the 2023–24 cycle confirms that the vast majority of black and Hispanic applicants came from Tiers 1–6. Almost all of them were admitted. Compl. ¶ 99. Tier 8 had the most white applicants—fewer than half of them received an invitation. *Id.*

2025–26 under the four-tier system, BPS modeling suggests that this was an aberration and that the Tier System should continue to suppress the white share of the invited student pool below the white share of the applicant pool. Compl. ¶ 115.

### A. School-age population is not the proper comparator

At the pleading stage, the School Committee cannot dispute any of this. Instead, it faults the Coalition for comparing acceptance rates to application rates, claiming that the "the 'eligible school-age population'" is the proper comparator. MTD at 11 (quoting *Boston Parent II*, 89 F.4th at 59). But it is implausible that the First Circuit's passing reference to school-age population created a new definition of disparate impact in an intentional discrimination case. It would be especially strange here, because the rule the School Committee says the First Circuit adopted is at odds with the one it applied when it rejected the Coalition's request for an injunction pending appeal in the Zip Code Plan case. There, the Court of Appeals criticized the Coalition's preferred before-and-after comparison and suggested that the proper comparator would be "a plan based on random selection." *Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Boston*, 996 F.3d 37, 46 (1st Cir. 2021). Because random selection would be expected to yield the same racial proportions as the applicant pool, that is the First Circuit's preferred benchmark.

What is more, the "school-age population" comparator is also at odds with the primary authority the First Circuit relied on in *Boston Parent II*—the Fourth Circuit's decision in the similar *Coalition for TJ* case. The panel majority in *Coalition for TJ* explained that "[t]he proper metric" is an "evaluation of a given racial or ethnic group's share of the number of applications to [the school] versus that group's share of the offers extended—in other words, the groups 'success rate' in gaining admission to [the school] under the challenged admissions policy." 68 F.4th at 881 (collecting cases). There is already much disagreement on this point, including a circuit split.

*Compare id. with Chinese Am. Citizens All.*, 116 F.4th at 171–72; *see also Coal. for TJ*, 68 F.4th at 903–05 (Rushing, J., dissenting) (rejecting the applicant-pool benchmark as promoting racial balancing and finding disparate impact where the proportion of the targeted group did not fall below its share of the applicant pool). The First Circuit opinion did not create a third distinct test for measuring disparate impact.

In any event, the school-age population comparator is nonsensical. Admissions criteria for competitive schools can only allocate seats among those who *actually apply*. Even in Title VII disparate-impact cases, for non-entry level jobs, the relevant population is typically smaller than everyone in an area. "[W]hen special qualifications are required to fill particular jobs, comparison to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Boston Police Superior Officers Fed'n v. City of Boston*, 147 F.3d 13, 21 (1st Cir. 1998) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501 (1989)). It's not surprising, then, that the Supreme Court in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 727, 732 (2007) (plurality opinion), referred to the overall district demographics when assessing assignments to typical public schools, but *Coalition for TJ* used the applicant pool comparator for a competitive school akin to the Exam Schools.[4] While the Title VII comparison is wrong in many ways, *see infra*, it certainly counsels against the School Committee's unprecedented school-age population benchmark.[5]

---

[4] Additionally, under the current criteria, a GPA of at least a B is required to apply. Boston Public Schools, *How Do I Apply*, https://www.bostonpublicschools.org/academics/exam-schools/how-to-apply (last visited Oct. 13, 2025). At this stage, there is no data on the racial composition of the eligible pool, but this confirms that school-age population is not the proper comparator.

[5] Strangely, the School Committee defends its school-age population comparator by insisting that "the *entire point* of the plan" was to create "a student population that much more accurately reflects the socioeconomic diversity of Boston's school-age population." MTD at 11–12. This reads as a concession of the School Committee's intent, but even if it were correct that this balancing goal is "constitutionally legitimate," that would not negate the *impact* of the policy.

**B.    The Coalition need not plead statistical significance**

The School Committee then argues that even if the applicant-pool comparator is correct, the Coalition failed to plead statistical significance. It says "the First Circuit held that to establish statistical significance a plaintiff must show that the probability that any alleged racial disparity occurred by chance is *less than five-percent*." MTD at 13 (citing *Jones v. City of Boston*, 752 F.3d 38, 50 (1st Cir. 2014)). Even if this were true (*Jones* appeared to accept this point without opposition), such a showing would likely require expert testimony that is not proper at the pleading stage. *See Ryan v. Greif, Inc.*, 708 F. Supp. 3d 148, 172 (D. Mass. 2023) (where expert testimony is required to prove a claim, "Plaintiffs do not bear the burden of providing any such evidence" at the pleading stage). *Jones* was decided on summary judgment with the benefit of a full record and expert testimony. Here, even if statistical significance were required, the Coalition would only have to allege enough to make it *plausible* that the impact was statistically significant. It has done so. The Complaint's allegations make it plausible that white "underrepresentation" is not random, but the product of the Tier Plan grouping white applicants disproportionately in a tier that subjects them to higher admission standards.[6]

**C.    The School Committee cannot redefine disparate impact in racial balancing terms**

Relatedly, the School Committee claims that "as between equally valid, facially neutral selection criteria the School Committee chose the alternative that created less disparate impact."

---

[6] In any event, statistical significance has no place in an intentional discrimination case. Unlike in a Title VII disparate-impact claim, impact is just one factor in evaluating discriminatory intent under *Arlington Heights*. *See Ricci v. DeStefano*, 557 U.S. 557, 587 (2009) (explaining that a "threshold showing of a statistical disparity . . . and nothing more" is required to make out "a prima facie case of disparate-impact liability"). If there is intentional discrimination, a plaintiff need not prove a statistically-significant impact. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 231–32 (4th Cir. 2016) (warning against requiring "too much" showing of disparate impact in an intentional discrimination case). Indeed, the First Circuit did not allude to such a requirement in *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 89–90 (1st Cir. 2004).

MTD at 13 (internal quotation marks omitted). This formulation assumes that academic criteria like GPA and test scores are suspect because they produce a class that does not align with the School Committee's preferred racial balance. That is contrary to decades of Supreme Court precedent condemning racial balancing as "patently unconstitutional." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013). Racial balancing inherently involves exactly what the School Committee says the Tier Plan does—placing a thumb on the scales to offset the impact of the academic indicators considered in isolation. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 221–23 (2023) (*SFFA*) (describing the balancing procedures at Harvard and the University of North Carolina). It is no wonder that, in defense of such a system, the School Committee essentially adopts the view of the dissenting Justices in *SFFA*. *Id.* at 408 (Jackson, J., dissenting) (arguing that it is necessary to "stare at racial disparity unblinkingly, and then do what evidence and experts tell us is required to level the playing field").

In Title VII parlance, the Coalition's *Arlington Heights* claim is akin not to a disparate-impact claim, but a disparate-treatment claim in which disparate impact is a factor that tends to show discrimination. *See supra* n.6; *see also Brown v. Town of Scarborough*, No. 2:24-cv-00366, 2025 WL 2430466, at *4 (D. Me. Aug. 22, 2025) ("Disparate treatment means intentional discrimination."). And in such a scenario, the defendant is not entitled to discriminate against some individuals to *avoid* a disparate impact on others unless it has "a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Ricci*, 557 U.S. at 585. The Coalition is not aware of any case where basic academic criteria for school admission have been invalidated solely on the basis of disparate impact. Far from doing "what disparate impact law encourages," MTD at 13, the School Committee has instead used the prior statistical disparity in admissions as impetus to discriminate by proxy against

15

white applicants. That is not avoiding disparate impact. It is simply racial discrimination.

## II.    The Coalition Plausibly Alleged That the School Committee Implemented the Tier Plan to Discriminate Against White Exam School Applicants

Finally, the School Committee maintains the Coalition has not plausibly alleged discriminatory intent. The School Committee's legal theory remains that the Coalition must show racial *animus* to prevail. MTD at 15. But even if that is true, the School Committee faces an uphill battle at this stage. The decisions in the Zip Code Plan case were on the merits after a full record, and indeed this Court criticized the Coalition for not seeking discovery to establish intent. *Boston Parent I*, 2021 WL 4489840, at *16. Now that the Coalition seeks just that, the School Committee is not entitled to dismissal at the pleading stage.

### A.    The Complaint allows a plausible inference of racial animus

Surviving a motion to dismiss is a "low bar." *Flipp v. Town of Rockland*, 613 F. Supp. 2d 141, 146 (D. Mass. 2009). That is particularly true in *Arlington Heights* cases, because the inquiry into whether racial discrimination infected a decision is inherently fact-bound. *See Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (quoting *Arce v. Douglas*, 793 F.3d 968, 977–78 (9th Cir. 2015), for the proposition that "when relying on *Arlington Heights* to demonstrate that an action was motivated by a discriminatory purpose, a plaintiff need provide very little such evidence to raise a genuine issue of fact . . . ."). So the Complaint need not allege facts relating to all four *Arlington Heights* factors. *See Brown*, 2025 WL 2430466, at *6. Its function is "to allege facts that 'in sum' make the claim 'at least plausible.'" *Id.* at *5 (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14–15 (1st Cir. 2011)).

The Coalition's Complaint contains more than enough such facts.

**Historical background.** The Complaint details the School Committee's past discrimination against white Exam School applicants, including two successful cases in the 1990s.

Compl. ¶¶ 22–27. Then it describes the process leading to the Zip Code Plan, during which this Court held three School Committee members harbored racial animus. Compl. ¶¶ 39–41, 46.[7]

**Sequence of events.** The Complaint alleges that deliberations on the Tier Plan began before the Boston Globe exposed the racist text messages between School Committee members Oliver-Davila and Rivera. Compl. ¶¶ 51–55. Those two members, who this Court found harbored racial animus specifically concerning white residents of West Roxbury, were on the School Committee as the Task Force resumed the work that the Working Group had done before the Zip Code Plan. *Id.* Adding to the environment in the time leading up to the School Committee's adoption of the Tier Plan, the School Committee's student representative declared "I too hate white people" at a School Committee meeting. Compl. ¶ 56.

**Legislative history.** The Complaint details the obsession of the Task Force, School Committee, and Superintendent with the racial impact of the admissions criteria. Compl. ¶¶ 57–70. Decisionmakers rejected a plausible alternative because modeling showed it would benefit white applicants. Compl. ¶ 65. Discussion was replete with language like "white supremacy," "antiracism," and "equity," demonstrating the all-consuming focus on race. Compl. ¶¶ 57–70.

These facts make it plausible that discovery will reveal enough racial animus for the Coalition to prevail even under the School Committee's legal theory. It certainly would not be shocking, as the School Committee approved the Tier Plan not long after three members had to

---

[7] The School Committee professes to be "puzzled" about the Complaint's allegations relating to the Zip Code Plan. MTD at 15. It fails to understand how they could be relevant once courts did not invalidate the Zip Code Plan. But there is nothing puzzling about relying on recent expressions of racial animus (then less than a year old) to build a case that the current policy was enacted with discriminatory intent. That's why historical background is relevant under *Arlington Heights*. And the ultimate result of the Zip Code Plan case does not negate this Court's findings of racial animus. The Coalition lost on disparate-impact grounds. Now, the Coalition alleges impact alongside discriminatory intent.

resign due to racist behavior. *Boston Parent I*, 2021 WL 4489840, at *13 n.16 (racism is "[l]ike *cancer*, when it appears it metastasizes"). Certainly, this Court has permitted *Arlington Heights* claims to proceed with less. *See Valentin v. Town of Natick*, 633 F. Supp. 3d 366, 374–75 (D. Mass. 2022) (allegations that a town board reversed its position on and then denied a special permit application for development due to alleged racially insensitive comments of constituents); *Centro Presente*, 332 F. Supp. 3d at 414–15 (allegations that federal officials terminated Temporary Protected Status for Haitians and Hondurans due to racial animus of President Trump and "an allegedly unreasoned shift in policy"); *see also Brown*, 2025 WL 2430466, at *4–5 (town's refusal to renew license of hotel until it evicted residents using federal emergency housing benefits—only racial evidence was disparate impact and "comments reflecting racial stereotypes" from community members). In short, even if the Coalition must ultimately show racial animus to prevail, it has alleged enough to make recovery on this theory plausible.[8]

### B.   Discriminatory intent does not require a showing of *animus*

In any event, the Coalition need not show that the School Committee was motivated by racial animus or hatred. The Complaint alleges—and the School Committee essentially admits, MTD at 15—that the School Committee implemented the Tier Plan to increase the share of black and Hispanic students admitted to the Exam Schools. The Tier Plan operates by disproportionately subjecting black and Hispanic students to lower admissions requirements than white students face. Yet the School Committee would have the Court see this as merely *helping* some groups, not

---

[8] The School Committee labels the Coalition's allegations "speculative," "unsupported," "periphrastic," and "improbable." MTD at 15–16. There's nothing speculative about the facts—most of which are publicly available. The Court must draw all "reasonable inferences" from these facts in favor of a plausible finding of intent. *Santiago*, 655 F.3d at 72. And while the Coalition's allegations are far from threadbare, "[a] well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted).

*hurting* others. As the Supreme Court recently said, "[t]his understanding of the admissions process is hard to take seriously." *SFFA*, 600 U.S. at 218. Like college admissions, Exam School admissions "are zero-sum. A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218–19. If the School Committee chose criteria designed to help certain racial groups, it by definition chose criteria designed to hurt the groups who do not get the benefit.

The zero-sum nature of competitive admissions distinguishes this case from *Anderson* and *Parents Involved*. *Anderson* was a challenge to a BPS student-assignment plan under which half the seats at each school were reserved for students within that school's "walk zone." 375 F.3d at 77. White parents challenged the plan, arguing that BPS had cited diversity as a reason for removing the former 100% walk-zone preference. *Id.* at 81. But the walk-zone preference wasn't zero-sum—the share of white students who received their first-choice school did not depend on the share of black students who got theirs (and indeed, more white than black students received their first choice). So, it made sense that "the mere invocation of racial diversity as a goal" was not enough to trigger strict scrutiny in that case. *Id.* at 87. Both means and motive matter.

*Parents Involved* also concerned a general student-assignment plan. The School Committee cites only Justice Kennedy's non-binding concurrence, but even that is a far cry from authorizing the use of racial proxies to achieve racial balance. Justice Kennedy merely noted that "it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition." *Parents Involved*, 551 U.S. at 788 (Kennedy, J., concurring in part and concurring in the judgment). In the context of general student assignment, this might be possible without discriminating. But where admission to a highly competitive school hangs in the balance, and the policy to "encourage" diversity amounts to a

racial proxy designed to achieve balancing, it is not.

Because the First Circuit decided the Zip Code Plan case on disparate-impact grounds, the only authority for the School Committee's position is *Coalition for TJ*, 68 F.4th at 885–86. The Fourth Circuit there rejected the parents' reliance on the zero-sum nature of admissions.[9] But the Supreme Court decided *SFFA* the very next month, warning that "'[w]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows,' and the prohibition against racial discrimination is 'levelled at the thing, not the name.'" *SFFA*, 600 U.S. at 230 (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)). This Court should follow the Supreme Court's lead and recognize that racial discrimination does not require animus or hatred. The Constitution does not contain an exception for "benign" racial discrimination. *Fisher*, 570 U.S. at 307–08. It is enough for the Coalition to allege that the School Committee implemented the Tier Plan "'because of' not merely 'in spite of,'" its racial effect. *Feeney*, 442 U.S. at 279.

## CONCLUSION

The School Committee's motion to dismiss should be denied.

Dated: October 16, 2025.

Respectfully submitted,

/s/ Christopher M. Kieser

JONATHAN HOUGHTON          CHRISTOPHER M. KIESER*
Mass. Bar No. 641688       Cal. Bar No. 298486
Pacific Legal Foundation    ERIN E. WILCOX*

---

[9] *Coalition for TJ* reversed a district court opinion that had relied on the zero-sum nature of competitive admissions to grant summary judgment in favor of a parent group. Another district court in the Fourth Circuit also came to this conclusion in denying an initial motion to dismiss in a similar case involving competitive middle school admission. *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, 560 F. Supp. 3d 929, 953 (D. Md. 2021) ("The Complaint also makes plausible that the County acted with a discriminatory motive in that it set out to increase and (by necessity) decrease the representation of certain racial groups in the middle school magnet programs to align with districtwide enrollment data."). The court ultimately granted a second motion to dismiss, but did not repudiate that position. 617 F. Supp. 3d 358, 370 (D. Md. 2022) ("the Court fully embraces its prior decision").

3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
(202) 888-6881
jhoughton@pacificlegal.org

GLENN E. ROPER*
Colo. Bar No. 38723
Pacific Legal Foundation
1745 Shea Center Drive, Suite 400
Highlands Ranch, Colorado 80129
(916) 503-9045
geroper@pacificlegal.org

Cal. Bar No. 337427
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
(916) 419-7111
ckieser@pacificlegal.org
ewilcox@pacificlegal.org

*Pro Hac Vice

*Attorneys for Plaintiff*

21

## CERTIFICATE OF SERVICE

I, Christopher M. Kieser, hereby certify that the foregoing document was served on the date referenced above on all represented Parties through PACER/NEXTGEN, and that there are no unrepresented participants.

/s/ Christopher M. Kieser
CHRISTOPHER M. KIESER